**UNITED STATES DISTRICT COURT      SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| ANCHOR AUTOCLAVE SYSTEMS,<br>A DIVISION OF ANCHOR EQUIPMENT<br>SALES, INC., | §<br>§<br>§<br>§ | United States Courts<br>Southern District of Texas<br>ENTERED<br><br>JUL 1 5 2003<br><br>Michael N. Milby, Clerk of Court |
| Plaintiff, | §<br>§ | |
| *versus* | §<br>§ | CIVIL ACTION H-02-4441 |
| TOUCHSTONE RESEARCH<br>LABORATORY, LTD., | §<br>§<br>§ | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION\

### I.  Introduction

Pending before the court is Defendant Touchstone Research Laboratory, Ltd.'s ("Touchstone") Motion to Dismiss Pursuant to Rule 12(b)(2) and Motion to Transfer Venue or Stay Pursuant to Rule 12(b)(3) (#3). Having reviewed the pending motions, the submissions of the parties, the pleadings, and the applicable law, this court recommends that Touchstone's motions to dismiss and to transfer venue be denied and that its motion to stay be granted.

### II.  Background

This case arises out of a dispute over an autoclave that Touchstone purchased from Plaintiff Anchor Autoclave Systems, a division of Anchor Equipment Sales, Inc. ("Anchor"). Autoclaves are pressurized, high-temperature machines used to process or sterilize compounds or metals for industrial applications. Anchor is a Texas corporation which manufactures autoclaves and related equipment, with its principal place of business located in Houston, Texas. Touchstone is a West



Virginia corporation which provides applied research and materials testing laboratory services, with its principal place of business located in Triadelphia, West Virginia.

Following several preliminary inquiries by representatives of Touchstone in 1999 and 2000, on June 20, 2001, Touchstone placed a written purchase order with Anchor for an autoclave and related accessories for a total price of $508,900.00, including shipping.  On June 22, 2001, Anchor submitted a proposal under which it would design, build, and ship F.O.B. Houston an autoclave for the previously specified price.  Within a few weeks, Touchstone requested in writing that its order be placed on hold.  On August 8, 2001, a meeting was held at Anchor's facility in Houston, Texas, to discuss the specifications and design of the custom-built autoclave, which was attended by three representatives of Touchstone, Everett Baker, Brian Joseph ("Joseph"), and Michael Brown, along with Alexander S. Allen, VIII ("Allen"), the President of Anchor, and his son, Alexander Allen, IX.  During the meeting, Allen mentioned that Anchor had previously built an autoclave which another customer had chosen not to purchase.  Joseph expressed an interest in purchasing the previously-built autoclave and hiring Anchor to re-engineer and refurbish that autoclave for Touchstone's applications.

On October 3, 2001, Touchstone submitted a purchase order for the refurbished autoclave, amending the previous purchase order and stating, "Decrease existing P.O. value from 508,900 to 384,600."  A statement of work ("S.O.W."), attached to the purchase order, does not specify the terms of delivery or where title will pass.  An S.O.W. dated January 17, 2002, from Touchstone to Anchor, however, reflects a total purchase price of $410,400.00 and the following terms: "50% down with P.O., balance at time equipment is shipped. Price: net, FOB Houston, valid for 30 days."  With regard to installation, the S.O.W. specifies: "Contractor shall

2

coordinate rigging, unloading, hook up system at Touchstone Research Laboratory facility in Wheeling W.V." As to checkout and training, the S.O.W. states: "Contractor shall conduct operator and maintenance training. Contractor shall verify system operation to trained Touchstone Research laboratory operators." The S.O.W. also includes a one-year warranty for the autoclave from the date of delivery and covers repair or replacement of parts found defective in materials or workmanship.

Over the course of the ensuing four months, Anchor re-engineered and redesigned the autoclave at its manufacturing facility in Houston, where Randy Handley ("Handley"), a representative of Touchstone, inspected the work and provided input. Following Touchstone's payment of the purchase price to Anchor at Houston on June 6, 2002, Anchor shipped the autoclave to West Virginia on June 7, 2002, designating the shipment "F.O.B. Houston." Handley advised Allen that the autoclave arrived at Touchstone's facility in West Virginia on June 10, 2002.

Touchstone maintains that the autoclave has not worked properly since its installation on June 10, 2002, contending that the "autoclave has never performed according to Touchstone's specifications, and its operation has resulted in sometimes violent breakdowns and explosions." Anchor asserts that soon after the autoclave arrived in West Virginia, Touchstone began to make demands upon Anchor to provide equipment and engineering for additional uses and specifications for the autoclave. Anchor further alleges that Anchor provided substantial parts and engineering instructions to Touchstone, even though Touchstone had represented to Anchor that its employees knew precisely what they wanted in terms of the autoclave's specifications, which were incorporated in the parties' contract, and that its employees knew how to operate and utilize the

3

autoclave. By letter dated October 8, 2002, counsel for Touchstone made a written demand on Anchor for adequate assurances pursuant to the Uniform Commercial Code that "all deficiencies in the autoclave will be remedied within thirty days from the date of this letter." Touchstone's counsel indicated that Touchstone would "immediately proceed to file a lawsuit seeking all damages, declaratory relief and/or equitable relief to which Touchstone is entitled as a result of Anchor Autoclave's complete and utter failure to date to comply with the requirements of its contract with Touchstone."

Three days later, on October 11, 2002, Anchor filed suit against Touchstone in the 215th Judicial District Court of Harris County, Texas, seeking: (1) a declaratory judgment that the autoclave Anchor sold Touchstone met all of the parties' contractual specifications and that Anchor had already provided Touchstone parts over and above the parties' contractual requirements; (2) damages for breach of contract occasioned by Touchstone's demanding parts over and above the specifications contained in the contract; and (3) damages for common law fraud based on Touchstone's misrepresentations concerning the expertise and skill of its personnel. Before service was effected, however, Allen, a registered professional engineer, traveled to Touchstone's facility in West Virginia to perform diagnostic tests and issue certified measurements on the autoclave; while at Touchstone's facility, Allen did not advise Touchstone's management that suit had been filed. In its lawsuit, Anchor claims that Touchstone represented to Anchor that Touchstone (i) had sufficient personnel and skills to operate the autoclave without Anchor's assistance, and (ii) did not require Anchor's assistance in the maintenance and operation of the autoclave, other than minimal initial training in operation and maintenance. Anchor further contends that it relied on Touchstone's misrepresentations and sold Touchstone the autoclave. Anchor also maintains that

4

Touchstone is seeking "to bully Anchor into providing personnel, labor, and features with respect to autoclave far beyond the contractual specifications and limited warranty."

On October 30, 2002, Anchor served Touchstone through the Texas Secretary of State under the Texas "Long Arm Statute" contained in Chapter 17 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 17.041-17.045. On November 25, 2002, Touchstone removed the action to the United States District Court for the Southern District of Texas, Houston Division, and filed its own lawsuit in the United States District Court for the Northern District of West Virginia, albeit initially against an improperly named defendant. In the West Virginia lawsuit, Touchstone alleges that it "informed Anchor that it required an autoclave which could be used in high-pressure, high-temperature applications and could be completely installed by Anchor for simple 'turnkey' operation by Touchstone" and that Anchor assured Touchstone that its autoclave met these specifications. In its amended complaint filed in West Virginia, Touchstone asserts claims for breach of contract, intentional interference with existing or prospective contractual relations, negligent interference with existing or prospective contractual relations, unjust enrichment, negligence, product liability, breach of the warranty of merchantability, breach of the warranty of fitness for a particular purpose, breach of express warranty, fraud/intentional misrepresentation, and negligent misrepresentation. Touchstone seeks compensatory damages, post-judgment interest, costs, and other equitable relief as the court may deem proper.

Touchstone alleges that Anchor's lawsuit was filed merely as a preemptive strike in response to Touchstone's request for adequate assurances and solely to avoid being haled into court in West Virginia. By order entered June 4, 2003, the United States District Court for the

5

Northern District of West Virginia denied Touchstone's motion to enjoin the instant action, finding that it should defer to this court to make findings regarding Anchor's alleged bad faith in bringing suit in Texas and whether this case constitutes an improper anticipatory lawsuit that should be enjoined. After noting that Touchstone's letter of October 8, 2002, put Anchor on notice that Touchstone was planning to file suit, Anchor filed suit in Texas just three days later, and Anchor's suit seeks mainly declaratory relief, the West Virginia court commented, "These factors suggest to this Court that Anchor has filed an anticipatory lawsuit in Texas, which suit was filed merely to preempt a suit by the proper plaintiff in this case, Touchstone." The court also denied Anchor's motion to dismiss or transfer venue to the Southern District of Texas, finding that Anchor had sufficient minimum contacts with West Virginia for the court to exercise personal jurisdiction over it in that state and that venue was proper in that forum.

Touchstone's current motions request the court to: (1) dismiss this action for lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2); (2) transfer venue to the Northern District of West Virginia pursuant to FED. R. CIV. P. 12(b)(3); or (3) stay this action pending resolution of Touchstone's action initiated in the Northern District of West Virginia.

III.     Analysis

A.     Motion to Dismiss for Lack of Personal Jurisdiction

In support of its motion to dismiss, Touchstone claims that Anchor has not established a *prima facie* case that its cause of action arose from Touchstone's contacts with Texas or that Touchstone systematically does business in Texas. Touchstone argues that the only contact it had with Texas was that it contracted with Anchor, a resident of Texas, to purchase the autoclave. Touchstone alleges that the purchase order agreed upon by the parties contemplated performance

of the contract in West Virginia by providing that Anchor would deliver and install the autoclave at Touchstone's facility in West Virginia and that Anchor would conduct operator and maintenance training at the Touchstone facility and verify the equipment's operation. Touchstone also points out that when the autoclave was found to be defective, Anchor came to Touchstone's facility in West Virginia to repair and test the equipment, rather than ship it back to Anchor's plant in Texas.

Touchstone further argues that it lacks general contacts with Texas because Touchstone has not filed a certificate of authority in this state, does not maintain a regular place of business in Texas, is not incorporated or licensed to do business in Texas, and did not sell any product or provide any service in Texas. In sum, Touchstone claims that its contacts with Texas are incidental to its activities directed at commerce—providing laboratory testing services throughout the West Virginia region—and cannot serve as the basis for personal jurisdiction in Texas.

Anchor, on the other hand, proffers numerous excerpts from the affidavit of Allen, Anchor's president, to show that Touchstone has sufficient minimum contacts to satisfy the requirements of personal jurisdiction. Anchor claims that Touchstone freely sought Anchor's services and products in Texas. Additionally, Anchor maintains that the contract was negotiated, made, and performed in Texas. Anchor notes that Touchstone sent employees to Texas to negotiate the contract terms, Anchor's performance of the re-engineering and refurbishment of the autoclave occurred in Texas, the parties agreed that shipment of the autoclave was to occur "F.O.B. Houston" (meaning that title to the product would pass to the purchaser in Houston), and Touchstone mailed payment of the contract price to Anchor in Houston. Finally, Anchor alleges that the Texas forum is more convenient to the parties than the West Virginia forum. Anchor points out that the non-party subcontractors and Anchor's employees who worked on the autoclave

are all located in Texas.  Anchor also alleges that it is more convenient for the employees of

Touchstone to travel to Texas than for Anchor's employees to travel to West Virginia because

Touchstone's employees previously traveled to Houston on business unrelated to the autoclave.

    1.   <u>Burden of Proof</u>

When a nonresident defendant files a motion to dismiss for lack of personal jurisdiction,

the party seeking to invoke federal court jurisdiction over the nonresident defendant has the burden

of showing that the exercise of personal jurisdiction is proper.  *See Revell v. Lidov*, 317 F.3d 467,

469 (5th Cir. 2002); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir.), *cert.*

*denied*, 531 U.S. 979 (2000); *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 592 (5th Cir. 1999);

*Felch v. Transportes Lar-Mex SA de CV*, 92 F.3d 320, 326 (5th Cir. 1996); *Wilson v. Belin*, 20

F.3d 644, 648 (5th Cir.), *cert. denied*, 513 U.S. 930 (1994).  Generally, to satisfy this burden,

the plaintiff need only present facts sufficient to establish a *prima facie* case of personal

jurisdiction; proof by a preponderance of the evidence is not required.  *See Central Freight Lines*

*Inc. v. APA Transp. Corp.*, 322 F.3d 376, 380 (5th Cir. 2003); *Revell*, 317 F.3d at 469; *Brown*

*v. Slenker*, 220 F.3d 411, 417 (5th Cir. 2000); *Kelly*, 213 F.3d at 854; *Alpine View Co. Ltd. v.*

*Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000); *Access Telecom, Inc. v. MCI Telecomms.*

*Corp.*, 197 F.3d 694, 716 (5th Cir. 1999), *cert. denied*, 531 U.S. 917 (2000); *Wien Air Alaska,*

*Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999); *Gardemal*, 186 F.3d at 592.  When ruling on

a motion to dismiss for lack of personal jurisdiction, the court must accept as true the plaintiff's

uncontroverted allegations contained in the complaint, so long as the allegations are not merely

conclusory, and resolve all factual conflicts in favor of the party seeking to invoke the court's

jurisdiction.  *See Central Freight Lines Inc.*, 322 F.3d at 380 (citing *Alpine View Co. Ltd.*, 205

F.3d at 214); *Revell*, 317 F.3d at 469; *Brown*, 220 F.3d at 417; *Kelly*, 213 F.3d at 854; *Access Telecom, Inc.*, 197 F.3d at 716; *Wien Air Alaska, Inc.*, 195 F.3d at 211; *Gardemal*, 186 F.3d at 592. The court may also consider "'affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'" *Revell*, 317 F.3d at 469 (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)).

2.    The Applicable Standard

A federal court has personal jurisdiction over a nonresident defendant in a diversity case when (1) the nonresident defendant is amenable to service of process under the forum state's long-arm statute and (2) the assertion of jurisdiction over the defendant is consistent with the Due Process Clause of the Fourteenth Amendment. *See Revell*, 317 F.3d at 469; *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 336 (5th Cir. 1999); *Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999); *Wilson*, 20 F.3d at 646-47. In Texas, the inquiry with respect to a nonresident defendant's amenability to service under the long-arm statute focuses on whether the exercise of jurisdiction comports with federal constitutional requirements, as the Texas long-arm statute extends as far as is permitted by federal due process. *See Central Freight Lines Inc.*, 322 F.3d at 380; *Revell*, 317 F.3d at 469-70; *Kelly*, 213 F.3d at 854; *Alpine View Co. Ltd.*, 205 F.3d at 214; *Access Telecom, Inc.*, 197 F.3d at 716; *Electrosource, Inc.*, 176 F.3d at 871; *Wilson*, 20 F.3d at 647. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which the individual has established no meaningful 'contacts, ties, or relations.'" *Dickson Marine, Inc.*, 179 F.3d at 336 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (citing *International Shoe*

9

*Co. v. Washington*, 326 U.S. 310, 316 (1945))); *accord Central Freight Lines Inc.*, 322 F.3d at

380; *Electrosource, Inc.*, 176 F.3d at 871.

Personal jurisdiction comports with federal constitutional requirements when (1) the

nonresident defendant has certain minimum contacts with the forum state resulting from an

affirmative act or acts on its part and (2) it is not unfair or unreasonable to require the nonresident

defendant to defend the lawsuit in the forum state. *See Burger King Corp.*, 471 U.S. at 475-76;

*International Shoe Co.*, 326 U.S. at 316; *Central Freight Lines Inc.*, 322 F.3d at 380; *Revell*, 317

F.3d at 470.  "'[T]he constitutional touchstone' for asserting personal jurisdiction over a

nonresident defendant is 'whether the defendant purposefully established "minimum contacts" in

the forum State.'" *Alpine View Co. Ltd.*, 205 F.3d at 215 (quoting *Burger King Corp.*, 471 U.S.

at 474).  The Supreme Court has held that contacts resulting from "'the unilateral activity of

another party or a third person'" who claims some relationship with a nonresident defendant

cannot alone satisfy the requirement of contact with the forum state. *Burger King Corp.*, 471 U.S.

at 475 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984));

*see Central Freight Lines Inc.*, 322 F.3d at 382 n.6; *Dickson Marine, Inc.*, 179 F.3d at 337;

*Electrosource, Inc.*, 176 F.3d at 871-72.  Likewise, "'random,' 'fortuitous,' or 'attenuated'

contacts" do not count in determining the existence of minimum contacts. *Dickson Marine, Inc.*,

179 F.3d at 337 (quoting *Burger King Corp.*, 471 U.S. at 475); *see Electrosource, Inc.*, 176 F.3d

at 871-72.

A court may exercise either general or specific jurisdiction over a nonresident defendant,

depending on the circumstances. *See Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414

n.8, 9 (1984); *Central Freight Lines Inc.*, 322 F.3d at 381; *Revell*, 317 F.3d at 470; *Kelly*, 213

F.3d at 854; *Alpine View Co. Ltd.*, 205 F.3d at 215; *Access Telecom, Inc.*, 197 F.3d at 716; *Gardemal*, 186 F.3d at 595. A court may exercise "specific jurisdiction" over a nonresident defendant when the lawsuit arises from or relates to the defendant's conduct within the forum state. *See Helicopteros Nacionales de Colombia, S.A.*, 466 U.S. at 414 n.8; *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 591 (5th Cir. 2003); *Kelly*, 213 F.3d at 854; *Alpine View Co. Ltd.*, 205 F.3d at 215; *Gardemal*, 186 F.3d at 595; *Dickson Marine, Inc.*, 179 F.3d at 336; *Felch*, 92 F.3d at 324. In fact, "even a single act can support jurisdiction," provided that it creates a "'substantial connection'" with the forum, as opposed to an "'attenuated affiliation.'" *Burger King Corp.*, 471 U.S. at 475, 476 n.18 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 299 (1980); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957); *see Wien Air Alaska, Inc.*, 195 F.3d at 211; *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415-16 (5th Cir. 1993); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1361 (5th Cir. 1990)).

"General jurisdiction," on the other hand, applies when the defendant's contacts at issue have no necessary relationship to the cause of action, but the forum nevertheless has an interest in the defendant because the defendant has continuing and systematic contacts with the forum. *See Central Freight Lines Inc.*, 322 F.3d at 381; *Revell*, 317 F.3d at 470; *Kelly*, 213 F.3d at 854; *Alpine View Co. Ltd.*, 205 F.3d at 215; *Gardemal*, 186 F.3d at 595; *Dickson Marine, Inc.*, 179 F.3d at 336; *Felch*, 92 F.3d at 326. Thus, to establish general jurisdiction, the plaintiff must show that the defendant has substantial contacts with the forum. *See Alpine View Co. Ltd.*, 205 F.3d at 217; *Gardemal*, 186 F.3d at 595; *Dickson Marine, Inc.*, 179 F.3d at 336.

For jurisdiction to be appropriate, not only must a defendant purposefully establish minimum contacts with the forum state, but the plaintiff's maintenance of the suit must also comport with the "traditional notions of fair play and substantial justice." *International Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see Central Freight Lines Inc.*, 322 F.3d at 380; *Revell*, 317 F.3d at 470; *Access Telecom, Inc.*, 197 F.3d at 716; *Dickson Marine, Inc.*, 179 F.3d at 336; *Electrosource, Inc.*, 176 F.3d at 871, 874. Hence, "[o]nce a plaintiff establishes minimum contacts between the defendant and the forum State, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Central Freight Lines Inc.*, 322 F.3d at 384 (citing *Wien Air Alaska, Inc.*, 195 F.3d at 215). "The defendant must make a 'compelling case.'" *Id.* (citing *Burger King Corp.*, 471 U.S. at 477). "In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies." *Id.* (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 115 (1987)); *see World-Wide Volkswagen Corp.*, 444 U.S. at 292; *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 631 (5th Cir. 1999); *Polythane Sys., Inc. v. Marina Ventures Int'l, Ltd.*, 993 F.2d 1201, 1206 (5th Cir. 1993), *cert. denied*, 510 U.S. 1116 (1994). Determinations regarding the fairness of the exercise of personal jurisdiction over nonresident defendants must be made on a case-by-case basis. *See Asahi Metal Indus. Co.*, 480 U.S. at 115; *Polythane Sys., Inc.*, 993 F.2d at 1206.

12

3.    Specific Jurisdiction

It is well settled that specific jurisdiction may arise without the nonresident defendant's ever stepping foot upon the forum state's soil or may arise incident to the commission of a single act directed at the forum. *See Burger King Corp.*, 471 U.S. at 476 (holding that specific personal jurisdiction cannot be avoided merely because the defendant did not physically enter the state and that it may be based on actions that are purposefully directed toward a resident of a forum state); *Central Freight Lines Inc.*, 322 F.3d at 382; *Wien Air Alaska, Inc.*, 195 F.3d at 211; *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990). "Although territorial presence and activity will frequently enhance a defendant's relationship to the forum state and reinforce the reasonableness of subjecting it to suit there, an inescapable fact of modern life dictates that a substantial amount of business will be transacted by mail and by electronic wire communications across state lines." *Central Freight Lines Inc.*, 322 F.3d at 385 (citing *Burger King Corp.*, 471 U.S. at 476). "So long as a commercial actor's efforts are 'purposefully directed' toward a resident of another State, the mere absence of physical contacts within the forum state cannot defeat personal jurisdiction there." *Id.* (citing *Burger King Corp.*, 471 U.S. at 476).

The appropriate inquiry is whether the defendant purposefully availed itself of the privilege of conducting activities in-state, thus invoking the benefits and protections of the forum state's laws, and whether the cause of action arises out of or relates to that act. *See Burger King Corp.*, 471 U.S. at 475; *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *Access Telecom, Inc.*, 197 F.3d at 716, 718; *Dickson Marine, Inc.*, 179 F.3d at 337. A nonresident defendant purposefully avails itself of the benefits and protections of a forum state by taking "purposeful and affirmative action" inside or outside of the state that has reasonably foreseeable consequences in the state. *Central*

13

*Freight Lines Inc.*, 322 F.3d at 382 & n.6 (citing *Mississippi Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1007 (5th Cir. 1982)); *see Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1268 (5th Cir. 1981); *WNS, Inc. v. Farrow*, 884 F.2d 200, 203 (5th Cir. 1989).  Purposeful availment also exists when the defendant's conduct and connection with the forum are such that the defendant may reasonably anticipate being haled into the forum state to defend a lawsuit.  *See Central Freight Lines Inc.*, 322 F.3d at 383; *Brown*, 220 F.3d at 418 (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 297); *Alpine View Co. Ltd.*, 205 F.3d at 215; *Electrosource, Inc.*, 176 F.3d at 872.  It is reasonable for a nonresident defendant to anticipate being haled into the forum state to defend a lawsuit when he is aware that the brunt of any injury from his actions will be felt in the forum state, even if his acts were committed outside the state.  *See Calder v. Jones*, 465 U.S. 783, 789 (1984).

        "'Contracting with a resident of the forum state does not alone support the exercise of jurisdiction over the defendant.'"  *ICEE Distribs., Inc.*, 325 F.3d at 591 (citing *Colwell Realty Inv., Inc. v. Triple T Inns of Ariz., Inc.*, 785 F.2d 1330, 1334 (5th Cir. 1986)).  Similarly, "[e]xchange of communications between a resident and a non-resident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws."  *Stuart*, 772 F.2d at 1193 (citing *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1983), *cert. denied*, 466 U.S. 962 (1984); *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 187-88 (5th Cir. 1978); *Benjamin v. Western Boat Bldg. Corp.*, 472 F.2d 723, 729 (5th Cir.), *cert. denied*, 414 U.S. 830 (1973)).  Instead, the courts "'look to the factors of prior negotiations, contemplated future consequences, terms of the contract, and the parties' actual course of dealing to determine whether [the defendant] purposefully established

14

minimum contacts with the forum.'" *ICEE Distribs., Inc.*, 325 F.3d at 591-92 (quoting *Stuart*, 772 F.2d at 1193). "At the threshold we seek the place where the contract is to be performed. That is a weighty consideration." *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 94 (5th Cir. 1992) (citing *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir.), *cert. denied*, 506 U.S. 867 (1992)). "If, however, the forum plaintiff's decision to perform its contractual obligation within its own forum state is totally unilateral, it cannot be viewed as purposeful on the part of the nonresident and the weight necessarily is diminished." *Id.* (citing *Mississippi Interstate Express, Inc.*, 681 F.2d at 1007).

Here, Anchor has alleged facts demonstrating that Touchstone engaged in negotiations, transactions, and activities in Texas from which both Anchor's and Touchstone's causes of action arise. While Touchstone maintains that the purchase order "clearly contemplated performance in West Virginia" because it anticipated delivery and training to take place in West Virginia, the essential performance of the contract was the designing, re-engineering, and refurbishment of the autoclave, all of which took place at Anchor's facility in Houston, Texas. Furthermore, Anchor's decision to perform its contractual obligation, retrofitting the autoclave, in Texas was not unilateral. Rather, after a series of preliminary inquiries, Touchstone made an effort to engage in business with Anchor in Texas by purchasing the existing autoclave housed at Anchor's manufacturing plant in Houston and retaining Anchor to redesign and refurbish it to Touchstone's specifications. Clearly, Touchstone knew or should have known that the majority of the engineering and manufacturing work would be performed in Texas.

Likewise, "'with respect to interstate contractual obligations, [the Court has] emphasized that parties who "reach out beyond one state and create continuing relationships and obligations

with citizens of another state" are subject to the regulations and sanctions for the consequences of their activities.'" *Stuart*, 772 F.2d at 1191 (quoting *Burger King Corp.*, 471 U.S. at 473 (quoting *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950))). In this instance, an employee of Touchstone initially contacted Anchor, inquiring about Anchor's interest in designing and manufacturing an autoclave for Touchstone. The same employee contacted Anchor by telephone at least three times in 1999 and on several more occasions in 2000. One year later, Touchstone announced its interest in discussing in earnest the possibility of purchasing an autoclave from Anchor, and, on at least one occasion, Touchstone sent employees from West Virginia to Anchor's office in Houston, to discuss the autoclave order. Also, at their own request, Touchstone personnel met with representatives of Anchor during another unrelated business trip to Houston. Furthermore, the fact that the second "original contract" was characterized as a modification of the "June order" supports the notion that Touchstone made repeated efforts to engage in business with Anchor in Texas. By inviting Anchor to do business, Touchstone "reached out" beyond West Virginia and agreed for the contract to be performed at least in part in Houston, Texas.

In addition, Touchstone performed part of the contract in Texas by sending an employee to Houston to take "an active role in the design, engineering, and manufacture" of the autoclave. By performing in Texas, the defendant was "no mere passive customer of [a] Texas corporation," but it purposefully availed itself of the privilege of conducting business within Texas. *Hydrokinetics, Inc.*, 700 F.2d at 1029; *see Command-Aire Corp.*, 963 F.2d at 94 (president traveled to Texas for the purpose of tailoring the pump manufacture to the needs of the defendant); *Southwest Offset, Inc. v. Hudco Publ'g Co., Inc.*, 622 F.2d 149, 151 (5th Cir. 1980). Unlike the defendant in *Hydrokinetics*, whose only performance in the forum state was sending payment

16

there, Touchstone not only made payment in Texas, but it sent an employee to Houston to inspect the autoclave and instruct Anchor's employees with respect to the re-engineering and refurbishment work. In *Southwest Offset, Inc.*, the Fifth Circuit determined that a non-resident defendant was more than a "passive customer" because it mailed camera-ready copies and proofs to Texas to help the plaintiff manufacture the product. *See* 622 F.2d at 152. By sending an employee to Texas to become involved in the redesign of the autoclave, Touchstone's participation far exceeded that of the defendant in *Southwest Offset, Inc.*, demonstrating that it was more than a "mere passive customer" of Autoclave.

Other relevant factors to consider include the "place of contracting, the law governing the contract, and the place at which title to the goods passed." *Command-Aire Corp.*, 963 F.2d at 94. The facts in this case are analogous to those of *Command-Aire Corp*, where the court found that a Texas court could exercise personal jurisdiction over a non-resident buyer. *See id*. In both *Command-Aire Corp.* and the case at bar, the nonresident buyer had an "ongoing relationship" with the forum resident seller and "initiated discussion, negotiations, and the ultimate contract respecting the sale." *Id*. at 95. In *Command-Aire Corp.*, all in-person negotiations for the contract occurred outside the nonresident's preferred forum. *See id*. Here, not only did all in-person negotiations occur outside of West Virginia, but they all occurred in Texas. Touchstone personnel called Anchor numerous times and visited Houston more than once during the initial discussions concerning the purchase of the autoclave. Likewise, the final meeting defining the parameters of the project prior to the issuance of the purchase order occurred in Anchor's Houston facility. Additionally, although the contract is silent regarding the governing law, it should be reasonably foreseeable to Touchstone that Texas law might apply. *See Product Promotions, Inc.*

17

*v. Cousteau*, 495 F.2d 483, 495 (5th Cir. 1974). In short, Touchstone "voluntarily entered a transaction with one it knew to be a Texas resident, a transaction which had a substantial connection with Texas and which [Touchstone] had reason to know could have consequences in Texas." *Id.* at 497.

Moreover, title to the autoclave passed to Touchstone in Houston, Texas, in accordance with the parties' agreement that the autoclave would be shipped "F.O.B. Houston." "The term 'F.O.B.' is an abbreviation for 'free on board' and means that the seller will deliver subject matter contracted for, on certain conveyance, without expense to buyer." BLACK'S LAW DICTIONARY 665 (6th ed. 1990). F.O.B. is "[a] delivery term which requires a seller to ship goods and bear the expense and risk of loss to the F.O.B. point designated. The invoice price includes delivery at seller's expense to that location. Title to goods usually passes from seller to buyer at the FOB location." *Id.* at 642. Where the term "f.o.b." (free on board) is used in an executory contract of sale, in the absence of an express provision for retention of title pending inspection, the term will be construed to require the seller to deliver the goods without expense to the buyer at the place and time mentioned, where title passes. *See Gessman v. Stephens*, 51 S.W.3d 329 (Tex. App.—Tyler 2001, no pet.) (citing *Ehrenberg v. Guerrero*, 225 S.W. 86, 88 (Tex. Civ. App.—El Paso 1920, no writ)); *accord Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 843 n.2 (2d Cir. 1985), *cert. denied*, 476 U.S. 1188 (1986) ("F.O.B. or Free on Board means that title to the property passes from the seller to buyer at the designated FOB point"). Finally, while an agreement to mail payment into the forum state does not weigh heavily in the calculus of contacts, it may be given some consideration. *See Command-Aire Corp.*, 963 F.2d at 94; *Stuart*, 772 F.2d

at 1193. It is undisputed that Touchstone made payment to Anchor for the autoclave at Houston,

Texas, on June 6, 2002.

Under the totality of the circumstances, the factors cited above support the conclusion that

Touchstone purposefully availed itself of the privilege of engaging in business activities in Texas,

thus invoking the benefits and protections of the laws of Texas. *See Burger King Corp.*, 471 U.S.

at 475; *Hanson*, 357 U.S. at 253; *Access Telecom, Inc.*, 197 F.3d at 716, 718; *Dickson Marine,*

*Inc.*, 179 F.3d at 337. As in *Central Freight Lines Inc.*:

> In this case, [Touchstone] clearly did purposefully "reach out" to [Anchor] in
> Texas by visiting [Anchor's] headquarters and engaging in negotiations with
> [Anchor] by mail and by telephone. Furthermore, [Touchtone] clearly did so with
> the goal of establishing a long-term association with [Anchor] and with the
> foreseeable result of causing economic activity within the forum state. On account
> of this, [Anchor] had fair warning that it could be sued in Texas for alleged breach
> of the . . . Agreement and for alleged intentional torts arising out of its
> performance under that agreement.

322 F.3d at 385-86.

Thus, despite the parties' dispute over the extent of Touchstone's contacts with Texas,

Anchor has set forth sufficient facts in its complaint and affidavit to constitute the requisite

minimum contacts with Texas necessary to establish a *prima facie* case of specific, personal

jurisdiction over Touchstone. Having found that specific jurisdiction is applicable in this case, the

court need not determine whether general jurisdiction also exists. *See Helicopteros Nacionales*

*de Colombia, S.A.*, 466 U.S. at 414 n.8, 9; *Kelly*, 213 F.3d at 854; *Alpine View Co. Ltd.*, 205

F.3d at 215; *Access Telecom, Inc.*, 197 F.3d at 716; *Gardemal*, 186 F.3d at 595; *Felch*, 92 F.3d

at 326. The next inquiry, then, is whether this court's exercise of personal jurisdiction over

Touchstone in this situation would comport with the traditional notions of fair play and substantial justice.

4.    Due Process

Here, under the factors enunciated in *Asahi Metal Indus. Co.* and *World-Wide Volkswagen Corp.*, the exercise of personal jurisdiction over Touchstone in Texas does not offend the traditional notions of fair play and substantial justice. *See Asahi Metal Indus. Co.*, 480 U.S. at 113; *World-Wide Volkswagen Corp.*, 444 U.S. at 292. Similar to the parties in *Central Freight Lines Inc.* and *Southwest Offset, Inc.*, the burden of requiring Touchstone to litigate in Texas is no greater than the burden of requiring Anchor to litigate in West Virginia. *See Central Freight Lines Inc.*, 322 F.3d at 384; *Southwest Offset, Inc.*, 622 F.2d at 152. Thus, the convenience factor is a "stand off." *Id.* at 149. Moreover, despite the contentions of Touchstone, Texas has an interest in adjudicating a dispute concerning Anchor's deployment of local personnel and resources in attempting to render the autoclave operable. Texas also has an interest in upholding and enforcing contracts negotiated, consummated, and in large part performed in the state.

As for the judicial system's interest in efficient resolution of the controversy, while a more timely resolution might be attained in the Northen District of West Virginia, where the dockets are markedly less congested, the marginal delay occasioned by this court's asserting personal jurisdiction over Touchstone is not repugnant to the precepts of fundamental fairness. *See Central Freight Lines Inc.*, 322 F.3d at 385. Touchstone has not established that this forum is "an unfair or unjust place to litigate this dispute." *Id.* at 386. This court is also unaware of any likelihood that hearing this case in a Texas forum would be contrary to the "shared interests of the states in furthering fundamental social policies." *Id.* at 384. In short, Touchstone "has failed to present

20

a compelling case in support of its claim that asserting personal jurisdiction in this case would be offensive to traditional notions of fair play and substantial justice." *Id.* at 385.

Accordingly, this court may properly exercise personal jurisdiction over Touchstone, and Touchstone's motion to dismiss pursuant to Rule 12(b)(2) should be denied.

B.    Motion to Transfer Venue

In support of its motion to transfer venue, Touchstone claims that West Virginia offers the more logical and convenient forum for adjudication. Touchstone contends that it would be more convenient for the witnesses who are crucial to both Anchor and Touchstone's claims and defenses —the repair personnel hired by Touchstone to repair the autoclave and the customers Touchstone lost as a result of the defective equipment—to transfer the venue of this case to the Northern District of West Virginia. Additionally, Touchstone argues that West Virginia is the site of the alleged wrong, in that it was where Touchstone's allegedly unreasonable demands and Anchor's performance occurred.

Anchor, on the other hand, maintains that the Southern District of Texas offers the more logical and convenient forum for the litigation. Anchor claims that the witnesses crucial to both Anchor's and Touchstone's claims and defenses are the employees and subcontractors hired by Anchor to re-engineer and refurbish the autoclave so that it would meet the contractual specifications. It further contends that any non-party witness who voluntarily agrees to testify at trial would face the hardship and expense of a trip to West Virginia. Finally, Anchor contends that it is a small, family-owned business with fewer financial resources than those available to Touchstone, making it less convenient for Anchor employees to travel to West Virginia than it is for Touchstone employees to travel to Texas.

1.    General Considerations

When the selected venue is proper, a motion to transfer venue from one district or division to another is governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a); *see In re Horseshoe Entm't*, \_\_\_ F.3d \_\_\_, No. 02-30682, 2003 WL 21498934, at *4 (5th Cir. July 1, 2003); *Casarez v. Burlington Northern/Santa Fe Co.*, 193 F.3d 334, 339 (5th Cir. 1999); *Barnett v. Kirby Inland Marine, Inc.*, 202 F. Supp. 2d 664, 666-67 (S.D. Tex. 2002); *Seabulk Offshore, Ltd. v. Dyn Marine Servs., Inc.*, 201 F. Supp. 2d 751, 754 (S.D. Tex. 2002); *Woolf v. Mary Kay Inc.*, 176 F. Supp. 2d 642, 646 (N.D. Tex. 2001).  The purpose of this statute is to prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.  *See Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964); *DataTreasury Corp. v. First Data Corp.*, 243 F. Supp. 2d 591, 593 (N.D. Tex. 2003); *Shoemake v. Union Pac. R.R. Co.*, 233 F. Supp. 2d 828, 829 (E.D. Tex. 2002); *LeDoux v. Isle of Capri Casinos, Inc.*, 218 F. Supp. 2d 835, 836 (E.D. Tex. 2002); *Woolf*, 176 F. Supp. 2d at 646; *Houston Trial Reports, Inc. v. LRP Publ'ns, Inc.*, 85 F. Supp. 2d 663, 667 (S.D. Tex. 1999).

Under § 1404(a), the movant has the burden of demonstrating that a change of venue is warranted.  *See Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir.), *cert. denied*, 493 U.S. 935 (1989); *Time, Inc. v. Manning*, 366 F.2d 690, 698 (5th Cir. 1966); *Shoemake*, 233 F. Supp. 2d at 829; *LeDoux*, 218 F. Supp. 2d at 837; *Barnett*, 202 F. Supp. 2d at 666; *Seabulk Offshore, Ltd.*, 201 F. Supp. 2d at 754; *McCaskey v. Continental Airlines, Inc.*, 133 F. Supp. 2d 514, 523 (S.D. Tex. 2001).  To prevail, the moving party must show that the balance of convenience and

justice weighs heavily in favor of a transfer of venue. *See Von Graffenreid v. Craig*, 246 F. Supp. 2d 553, 563 (N.D. Tex. 2003); *DataTreasury Corp.*, 243 F. Supp. 2d at 593; *Shoemake*, 233 F. Supp. 2d at 829; *Mohamed v. Mazda Motor Corp.*, 90 F. Supp. 2d 757, 768 (E.D. Tex. 2000); *Henderson v. AT&T Corp.*, 918 F. Supp. 1059, 1065 (S.D. Tex. 1996); *Continental Airlines, Inc. v. American Airlines, Inc.*, 805 F. Supp. 1392, 1395 (S.D. Tex. 1992). Therefore, when assessing the merits of a § 1404(a) motion, the court must determine if a transfer would make it substantially more convenient for the parties to litigate the case. *See Gardipee v. Petroleum Helicopters, Inc.*, 49 F. Supp. 2d 925, 928 (E.D. Tex. 1999); *Gundle Lining Constr. Corp. v. Fireman's Fund Ins. Co.*, 844 F. Supp. 1163, 1165 (S.D. Tex. 1994).

The decision to transfer a pending case is committed to the sound discretion of the district court. *See Van Dusen*, 376 U.S. at 616; *Casarez*, 193 F.3d at 339; *Peteet*, 868 F.2d at 1436; *Jarvis Christian Coll. v. Exxon Corp.*, 845 F.2d 523, 528 (5th Cir. 1988); *Shoemake*, 233 F. Supp. 2d at 830; *LeDoux*, 218 F. Supp. 2d at 836; *Seabulk Offshore, Ltd.*, 201 F. Supp. 2d at 754; *Woolf*, 176 F. Supp. 2d at 646. "The first issue that a district court must address in ruling on a motion to transfer under § 1404(a) is the question of whether the judicial district to which transfer is sought qualifies under the applicable venue statutes as a judicial district where the civil action 'might have been brought.'" *In re Horseshoe Entm't*, 2003 WL 21498934, at *4; *accord Barnett*, 202 F. Supp. 2d at 667; *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at 667 n.1.

In the case at bar, the Northern District of West Virginia is clearly a district where the action might have been brought, as Touchstone is incorporated in West Virginia and its principal place of business is located in the Northern District of West Virginia. The applicable venue statute provides:

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a); *see McCaskey*, 133 F. Supp. 2d at 523.  It is undisputed that Touchstone

"resides" in the Northern District of West Virginia at Triadelphia, West Virginia, one of the bases

for the maintenance of venue.  In addition, the autoclave which is the subject of this action is now

situated in that district.

When the movant meets this threshold requirement, motions to transfer are adjudicated by

a district court through "individualized, case-by-case considerations of convenience and fairness."

*Van Dusen*, 376 U.S. at 622; *accord Jackson v. West Telemarketing Corp. Outbound*, 245 F.3d

518, 522 (5th Cir.), *cert. denied*, 534 U.S. 972 (2001); *Shoemake*, 233 F. Supp. 2d at 829-30.

The court balances a number of case-specific factors.  *See Stewart Org., Inc. v. Ricoh Corp.*, 487

U.S. 22, 29 (1988); *Jackson*, 245 F.3d at 522 n.4; *Houston Trial Reports, Inc.*, 85 F. Supp. 2d

at 668.  "Both private and public interest factors influence the court's transfer determination."

*Id.*; *accord S & J Diving, Inc. v. Doo-Pie, Inc.*, No. Civ. A. H-02-0293, 2002 WL 1163627, at

*5 (S.D. Tex. May 30, 2002).

Private interest factors, which involve the preferences and conveniences of the parties and

witnesses, include:  (1) the availability and convenience of witnesses and parties; (2) the cost of

obtaining the attendance of witnesses and other trial expenses; (3) the location of books and

records; (4) the place of the alleged wrong; (5) the plaintiff's choice of forum; and (6) the

possibility of delay and prejudice if transfer is granted. *See LeDoux*, 218 F. Supp. 2d at 836-37;

*Seabulk Offshore, Ltd.*, 201 F. Supp. 2d at 754; *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at

668 (citing *LeBouef v. Gulf Operators, Inc.*, 20 F. Supp. 2d 1057, 1059 (S.D. Tex. 1998);

*Dearing v. Sigma Chem. Co.*, 1 F. Supp. 2d 660, 664 (S.D. Tex. 1998); *Dupre v. Spanier Marine*

*Corp.*, 810 F. Supp. 823, 825 (S.D. Tex. 1993); *Hogan v. Malone Lumber, Inc.*, 800 F. Supp.

1441, 1443 (E.D. Tex. 1992)).  The public interest factors address broader objectives, such as:

(1) the administrative difficulties caused by court congestion; (2) the local interest in adjudicating

local disputes; (3) the unfairness of burdening citizens in an unrelated forum with jury duty; and

(4) the avoidance of unnecessary problems in conflict of laws. *See Walter Fuller Aircraft Sales,*

*Inc. v. Republic of Philippines*, 965 F.2d 1375, 1389 (5th Cir. 1992); *Shoemake*, 233 F. Supp.

2d at 835; *LeDoux*, 218 F. Supp. 2d at 837; *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at 668

(citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995)).

    2.    <u>Private Interest Factors</u>

        a.    <u>Availability and Convenience of Witnesses and Parties</u>

Anchor points out that venue is proper in the Southern District of Texas because that is

where a substantial part of the events and activities of the parties occurred.  Anchor and

Touchstone negotiated the contract at Anchor's office in Houston, Anchor performed the contract

at its manufacturing facility in Houston, and Touchstone's alleged fraud and misrepresentations

occurred in this district, forming the basis of Anchor's claim. *See General Latex & Chem. Corp.*

*v. Phoenix Medical Tech. Inc.*, 765 F. Supp. 1246, 1250-51 (W.D.N.C. 1991).  Anchor is a

resident of Texas, and there are a number of witnesses residing in this district upon whose

testimony Anchor intends to rely, including the employees and subcontractors who redesigned and refurbished the autoclave to Touchstone's specifications.

Touchstone argues that West Virginia would be the more convenient forum for the parties because it is a resident of West Virginia and its employees who may serve as witnesses at trial reside there. Touchstone also contends that the primary third-party witnesses, the personnel hired to repair the autoclave and the customers lost as a result of the inoperable autoclave, are located in West Virginia.

The relative convenience of the witnesses is an important factor to be considered in ruling on a motion under § 1404(a). *See LeDoux*, 218 F. Supp. 2d at 837; *Seabulk Offshore, Ltd.*, 201 F. Supp. 2d at 755; *Woolf*, 176 F. Supp. 2d at 650; *McCaskey*, 133 F. Supp. 2d at 527; *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at 668; *LeBouef*, 20 F. Supp. 2d at 1059. In considering the availability and convenience of witnesses, a court must concentrate primarily upon the availability and convenience of key witnesses. *See Shoemake*, 233 F. Supp. 2d at 832; *McGinnis v. Eli Lilly & Co.*, 181 F. Supp. 2d 684, 687 (S.D. Tex. 2002); *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at 668; *Dupre*, 810 F. Supp. at 825; *Continental Airlines, Inc.*, 805 F. Supp. at 1396-97; *Young v. Armstrong World Indus., Inc.*, 601 F. Supp. 399, 401-02 (N.D. Tex. 1984). Indeed, "'the convenience of one key witness may outweigh the convenience of numerous less important witnesses.'" *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at 668 (quoting *LeBouef*, 20 F. Supp. 2d at 1060); *accord Continental Airlines, Inc.*, 805 F. Supp. at 1396; *see Dupre*, 810 F. Supp. at 825; *Young*, 601 F. Supp. at 401-02. Where the key witnesses are employees of the party seeking transfer, however, their convenience is entitled to less weight because the party is able to

26

compel their attendance. *See AMS Staff Leasing v. Starving Students, Inc.*, No. 3-03-CV-0183-BD, 2003 WL 21436476, at *3 (N.D. Tex. June 18, 2003).

"When determining whether a particular venue is more convenient to witnesses the courts do not limit their investigation to a review of which party can produce the longer witness list." *Aquatic Amusement Assocs. Ltd. v. Walt Disney World Co.*, 734 F. Supp. 54, 57 (N.D.N.Y. 1990). Courts have "'uniformly refused to let applications for transfer become a battle of numbers.'" *Woolf*, 176 F. Supp. 2d at 650 (quoting *Dupre*, 810 F. Supp. at 826); *accord Fletcher v. Southern Pac. Transp. Co.*, 648 F. Supp. 1400, 1402 (E.D. Tex. 1986). Rather, the court should inquire into the nature and quality of the witnesses' potential testimony with regard to the issues in dispute. *See Young*, 601 F. Supp. at 401-02; *see also Barnett*, 202 F. Supp. 2d at 668.

In this situation, each set of potential witnesses will be inconvenienced if the suit is not tried in the district in which they reside. Touchstone argues that the key witnesses to this dispute are the personnel hired by Touchstone to repair the autoclave and the specific customers it lost as a result of the defective autoclave. While it is likely that the repair personnel are familiar with the problems of the autoclave, Anchor's claims in this action focus on Touchstone's alleged misrepresentations concerning the expertise of its employees and its alleged unreasonable demands for additional assistance from Anchor, representations and requests that were made in Houston and about which the repair personnel would have little to offer. Similarly, the testimony of Touchstone's lost customers would not help determine whether Anchor was fraudulently induced to enter into the contract or whether Touchstone has made unreasonable demands on Anchor. Hence, Touchstone has not shown that the interests of the witnesses and parties weigh heavily in favor of a transfer to West Virginia.

b.    <u>Cost of Obtaining the Attendance of Witnesses and other Expenses</u>

The cost of obtaining the attendance of witnesses and other trial expenses will be burdensome for either party if it is required to litigate outside its home district.  Compulsory process will be available only as to the employees and other witnesses who reside in the district of trial.  *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *Hess v. Gray*, 85 F.R.D. 15, 25 (N.D. Ill. 1979); *Morgan v. Illinois Cent. R.R. Co.*, 161 F. Supp. 119, 120 (S.D. Tex. 1958). The expense involved in providing the transportation, lodging, and incidental costs for willing witnesses in the opposing party's home forum will be substantial.  *See Time, Inc.*, 366 F.2d at 698.  In view of the variety of airline flights, hotels, and restaurants available in Houston, contrasted with the more restricted air service and more limited accommodations available in Wheeling, West Virginia, however, the burden of traveling to West Virginia from Texas would likely be greater.  Nevertheless, granting a transfer of venue under these circumstances would primarily serve to shift the balance of inconvenience from the moving party to the nonmoving party, an outcome that is disfavored by the courts.  *See, e.g., Continental Airlines, Inc.*, 805 F. Supp. at 1395 n.10; *Burger King Corp. v. Thomas*, 755 F. Supp. 1026, 1030 (S.D. Fla. 1991); *Cumis Ins. Soc'y, Inc. v. South-Coast Bank*, 587 F. Supp. 339, 348 (N.D. Ind. 1984); *Dayton Power & Light Co. v. East Kentucky Power Coop., Inc.*, 497 F. Supp. 553, 555 (E.D. Ky. 1980); *Hoster v. Monongahela Steel Corp.*, 492 F. Supp. 1249, 1254 (W.D. Okla. 1980).

c.    <u>Location of Books and Records</u>

Because both Anchor's manufacturing facility and administrative office are located in Houston and a significant part of the events leading up to this lawsuit took place in Houston, it stands to reason that the vast majority of the books and records related to the claims at issue

remain in the Southern District of Texas. The engineering and manufacturing data concerning the autoclave are undoubtedly in the possession of Anchor in Houston. There are likely books and records in West Virginia, however, documenting Touchstone's problems with the autoclave. Nevertheless, this factor does not mandate a transfer to West Virginia.

### d.    Place of the Alleged Wrong

The place of the alleged wrong is a significant factor in the transfer analysis. *See Robertson v. M/V Cape Hunter*, 979 F. Supp. 1105, 1108 (S.D. Tex. 1997); *Henderson*, 918 F. Supp. at 1067; *Dupre*, 810 F. Supp. at 827. Although Touchstone contends that the wrong occurred in West Virginia because that is where the autoclave was delivered, installed, and ultimately failed, Anchor views the wrong as Touchstone's alleged misrepresentations and demands for additional services, which were made in Houston. Thus, depending on the perspective taken, the place of the alleged wrong varies, but it does not necessarily compel a transfer of venue to West Virginia.

### e.    Plaintiff's Choice of Forum

It is well established that "[t]he plaintiff has the right to select the forum in which the lawsuit he initiates is to proceed." *FTC v. Multinet Mktg., LLC*, 959 F. Supp. 394, 396 (N.D. Tex. 1997) (citing *Gilbert*, 330 U.S. at 508; *Time, Inc.*, 366 F.2d at 698); *accord Peteet*, 868 F.2d at 1436. In determining the propriety of a transfer of venue under § 1404(a), however, the plaintiff's choice of forum is not accorded the decisive weight it enjoyed under the doctrine of *forum non conveniens. See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981); *Radio Santa Fe, Inc. v. Sena*, 687 F. Supp. 284, 287 (E.D. Tex. 1988). Today, the plaintiff's choice of forum is "clearly a factor to be considered but in and of itself it is neither conclusive nor determinative."

29

*In re Horseshoe Entm't*, 2003 WL 21498934, at *5; *Shoemake*, 233 F. Supp. 2d at 830-31; *Harris Trust & Sav. Bank v. SLT Warehouse Co.*, 605 F. Supp. 225, 227 (N.D. Ill. 1985). Nevertheless, the plaintiff's choice of forum is normally accorded substantial deference, especially when the forum is the plaintiff's "'home.'"  *Houston Trial Reports, Inc.*, 85 F. Supp. 2d at 668; *see Dearing*, 1 F. Supp. 2d at 665; *Henderson*, 918 F. Supp. at 1067-68; *Dupre*, 810 F. Supp. at 825; *Continental Airlines*, 805 F. Supp. at 1396.

Unless the evidence is "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."  *Gilbert*, 330 U.S. at 508; *see Schexnider v. McDermott Int'l Corp.*, 817 F.2d 1159, 1163 (5th Cir.), *cert. denied*, 484 U.S. 977 (1987); *AMS Staff Leasing*, 2003 WL 21436476, at *3; *Sinko v. St. Louis Music Supply Co.*, 603 F. Supp. 649, 652 (W.D. Tex. 1984). Indeed, "[a] plaintiffs' choice of forum should only be disturbed upon 'a clear showing of facts that establish either "oppressiveness or vexatiousness towards a defendant as to be out of proportion to a plaintiffs' convenience . . . or [that] make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems."'" *Multinet Mktg., Inc.*, 959 F. Supp. at 396 (quoting *Merle Norman Cosmetics v. Martin*, 705 F. Supp. 296, 302 (E.D. La. 1988) (quoting *Koster v. American Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947))). Touchstone has made no such showing.  As discussed above, Touchstone chose to contract with a Texas resident and sent personnel to Houston on a number of occasions in connection with the transaction at issue.  Hence, Anchor's choice of a Texas forum could not be viewed as unduly oppressive or vexatious and, therefore, should not be disturbed.

f.    Possibility of Delay and Prejudice if Transfer is Granted

Another consideration is the possibility of delay, since "'[a] prompt trial . . . is not without

relevance to the convenience of parties and witnesses and the interest of justice.'" *Dupre*, 810 F.

Supp. at 827 (quoting *Fannin v. Jones*, 229 F.2d 368, 369-70 (6th Cir.), *cert. denied*, 351 U.S.

938 (1956)).  In *In re Horseshoe Entertainment*, the Fifth Circuit "recognize[d] that in rare and

special circumstances a factor of 'delay' or of 'prejudice' might be relevant in deciding the

propriety of transfer, but only if such circumstances are established by clear and convincing

evidence."  2003 WL 21498934, at *5; *accord Shoemake*, 233 F. Supp. 2d at 834-35.  As the

*Dupre* court noted, the Southern District's adoption of the Civil Justice Reform Act of 1991 has

enabled it to dispose of cases in an expeditious manner.  *See* 810 F. Supp. at 828.  Although the

dockets are more congested in the Southern District of Texas than in the Northern District of West

Virginia, this case has been on file for over nine months in both fora, and a transfer at this

juncture would not necessarily lead to a more speedy disposition in West Virginia.

3.    Public Interest Factors

The court must also consider factors of public interest in determining whether a case should

be transferred to another district.  *See Gilbert*, 330 U.S. at 508.  One such consideration is the

relative congestion of the courts at issue.  *See id.*  The dockets in the Northern District of West

Virginia are not as congested as those of the Southern District of Texas.  Statistics maintained by

the Administrative Office of the United States Courts reflect that as of September 30, 2002, there

were 748 cases pending in the Northern District of West Virginia, with an average of 249 cases

per district judge.  By contrast, in the Southern District of Texas, there were 7,904 pending cases,

with an average of 416 cases per district judge.  The time from filing to trial, however, differs by

31

only about three months, 15.5 months in the Northern District of West Virginia and 18.9 months in the Southern District of Texas. Therefore, although comparative docket congestion is a factor that favors a transfer of venue, the resulting anticipated delay is insufficient to tip the balance of the other factors that favor the retention of jurisdiction.

Anchor describes itself as a small, family-owned business based in Houston, Texas, that employs several members of the community. Moreover, Anchor's claims for breach of contract and fraud arose in this district. *See Burger King Corp.*, 755 F. Supp. at 1029; *Resolution Trust Corp. v. Cumberland Dev. Corp. of Miss., Inc.*, 776 F. Supp. 1146, 1150 (S.D. Miss. 1990). Because the party harmed by the alleged breach is a resident of this district, fellow residents have "an interest in having this controversy decided at home, and alleviates the concern of burdening citizens of an unrelated forum with jury duty." *DiMark Mktg., Inc. v. Louisiana Health Serv. & Indem. Co.*, 913 F. Supp. 402, 409 (E.D. Pa. 1996). The Southern District of Texas has a compelling interest in enforcing contracts that are allegedly breached in this district, especially when the contract calls for the payment of monies here. In short, "local communities have an interest in local adjudication." *The News-Journal Corp. v. Foxman*, 939 F.2d 1499, 1513 (11th Cir. 1991).

Under Texas conflicts of law analysis, Texas law would appear to be applicable, at least in part, to this dispute, as Texas has the most significant relationship to the transaction. *See In re Air Disaster at Ramstein Air Base*, 81 F.3d 570, 576-77 (5th Cir.), *modified on other grounds*, 88 F.3d 340 (5th Cir.), *cert. denied*, 519 U.S. 1028 (1996); *see also De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413-14 (5th Cir.), *cert. denied*, 516 U.S. 865 (1995); *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735-37 (Tex. 1997); *Gutierrez v. Collins*, 583 S.W.2d 312,

318-19 (Tex. 1979); *Vizcarra v. Roldan*, 925 S.W.2d 89, 90-91 (Tex. App.—El Paso 1996, no writ); *Crisman v. Cooper Indus.*, 748 S.W.2d 273, 276-77 (Tex. App.—Dallas 1988, writ denied). The contract was negotiated and consummated in Texas, the alleged misrepresentations and demands for additional services were made here, and title to the goods passed and payment was made in this forum. Clearly, this court would be more familiar with the nuances of Texas law than a court in another state. *See General Accident Ins. Co. v. Travelers Corp.*, 666 F. Supp. 1203, 1207 (N.D. Ill. 1987); *St. Cyr v. Greyhound Lines, Inc.*, 486 F. Supp. 724, 726 (E.D.N.Y. 1980). To the extent West Virginia law may apply, however, this court, like all federal district courts, is experienced in applying the law of other jurisdictions and can certainly do so in this case. *See AMS Staff Leasing*, 2003 WL 21436476, at *3.

Finally, Touchstone does not contend that it would be denied a fair trial in the Southern District of Texas. In the absence of such a concern, the defendant has failed to meet its burden of showing that a balance of the relevant factors and circumstances substantially favors transfer to the Northern District of West Virginia. A transfer of venue would simply shift the balance of inconvenience from Touchstone to Anchor. Under these circumstances, a transfer of venue to the Northern District of West Virginia is not warranted.

C.    Motion to Stay

Finally, in support of its motion to stay this action pending the outcome of Touchstone's subsequent action filed in West Virginia, Touchstone argues that there are compelling circumstances that favor a stay, including the contentions that Anchor filed an anticipatory lawsuit and acted in bad faith. Touchstone maintains that it, rather than Anchor, is the proper plaintiff-in-interest in this dispute. Touchstone also claims that Anchor filed this suit within three days after

33

receiving Touchstone's demand for adequate assurances.  Touchstone claims that it issued its demand for adequate assurances in accordance with its obligations as a buyer under Section 2.609 of the Uniform Commercial Code in an attempt to permit Anchor to remedy the defects in the autoclave before resorting to legal action.  In doing so, Touchstone claims it is being penalized for attempting to resolve this dispute without judicial intervention.  Lastly, Touchstone alleges that Anchor demonstrated bad faith gamesmanship and procedural fencing.  Touchstone alleges that Anchor sat on the anticipatory complaint it had already filed in Texas and did not serve it upon Touchstone until after the negotiations had reached an impasse.

Anchor, on the other hand, maintains that compelling circumstances to avoid the application of the "first-filed rule" do not exist because there is no showing of oppressiveness or vexatiousness associated with the forum selection.  To the contrary, Anchor contends that Touchstone has subjected Anchor to oppression and vexation by filing the subsequent West Virginia action even though contract performance occurred in Texas, the critical witnesses are located here, and personal jurisdiction over Anchor is lacking in West Virginia.

"'The well-established rule is that in cases of concurrent jurisdiction, "the first court in which jurisdiction attaches has priority to consider the case."'" *Anheuser-Busch, Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 418 n.3 (8th Cir. 1999) (quoting *United States Fire Ins. Co. v. Goodyear Tire & Rubber Co.*, 920 F.2d 487, 488 (8th Cir. 1990) (quoting *Orthmann v. Apple River Campground Inc.*, 765 F.2d 119, 121 (8th Cir. 1985))); *accord EEOC v. University of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990); *Ellicott Mach. Corp. v. Modern Welding Co.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974); *Mattel, Inc. v. Louis Marx & Co.*, 353 F.2d 421, 423 (2d Cir. 1965), *cert. dism'd*, 384 U.S. 948 (1966).  "To conserve judicial resources and

avoid conflicting rulings, the first-filed rule gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction." *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir. 1993) (citing *Goodyear Tire & Rubber Co.*, 920 F.2d at 488); *accord University of Pa.*, 850 F.2d at 971. "[T]he rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." *Id.* at 977 (citing *Church of Scientology v. United States Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979); *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 930 (3d Cir. 1941), *cert. denied*, 315 U.S. 813 (1942)).

Courts in the Fifth Circuit generally follow the "first-filed rule" in deciding which court should maintain jurisdiction over claims that arise out of the same subject matter but are pressed in different suits. *See West Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 730 (5th Cir. 1985) ("federal courts have long recognized that . . . comity requires federal district courts . . . to exercise care to avoid interference with each other's affairs"); *accord Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1161 n.28 (5th Cir. 1992), *cert. denied*, 506 U.S. 1079 (1993); *Municipal Energy Agency v. Big Rivers Elec. Corp.*, 804 F.2d 338, 343 (5th Cir. 1986); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971); *Igloo Prods. Corp. v. The Mounties, Inc.*, 735 F. Supp. 214, 217 (S.D. Tex. 1990); *Superior Savings Ass'n v. Bank of Dallas*, 705 F. Supp. 326, 330 (N.D. Tex. 1989). "As between federal district courts, . . . the general principle is to avoid duplicative litigation." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). "The first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank." *University of Pa.*, 850 F.2d at 971; *accord First City Nat'l Bank & Trust Co. v. Simmons*, 878

F.2d 76, 79-80 (2d Cir. 1989) ("The first to file rule embodies considerations of judicial administration and conservation of resources"). "'It is of obvious importance to all the litigants to have a single determination of their controversy, rather than several decisions which if they conflict may require separate appeals to different circuit courts of appeals.'" *University of Pa.*, 850 F.2d at 974 (quoting *Crosley Corp.*, 122 F.2d at 929). "Comity must serve as a guide to courts of equal jurisdiction to exercise forbearance to avert conflicts and to avoid 'interference with the process of each other.'" *Id.* (quoting *Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922)).

The first-filed rule, however, "is not intended to be rigid, mechanical, or inflexible," but is to be applied in a manner best serving the interests of justice. *Orthmann*, 765 F.2d at 121; *accord Goodyear Tire & Rubber Co.*, 920 F.2d at 488; *University of Pa.*, 850 F.2d at 972, 976; *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982). "The prevailing standard is that 'in the absence of compelling circumstances,' the first-filed rule should apply." *Goodyear Tire & Rubber Co.*, 920 F.2d at 488 (quoting *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982)); *accord Orthmann*, 765 F.2d at 121. Thus, when compelling circumstances do not exist, "the Court initially seized of a controversy should be the one to decide whether it will try the case." *Mann Mfg., Inc.*, 439 F.2d at 407.

Nevertheless, there "is not a mandate directing wooden application of the rule without regard to rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping." *University of Pa.*, 850 F.2d at 972. "District courts have always had discretion to retain jurisdiction given appropriate circumstances justifying departure from the first-filed rule." *Id.* (citing *Crosley Corp. v. Westinghouse Elec. & Mfg. Co.*, 130 F.2d 474, 475-76 (3d Cir.), *cert.*

36

*denied*, 317 U.S. 681 (1942); *Pacesetter Sys., Inc.*, 678 F.2d at 95; *Mattel, Inc.*, 353 F.2d at 423-24 & n.4).  As the Third Circuit noted in *University of Pa.*:  "Bad faith and forum shopping have always been regarded as proper bases for departing from the rule.  Similarly, courts have rejected the rule when the second-filed action had developed further than the initial suit and when the first-filing party instituted suit in one forum in anticipation of the opposing party's imminent suit in another, less favorable, forum."  *Id.* at 976-77 (citations omitted).

One of the special circumstances cited by courts that have declined to apply the first-filed rule is an indication that the first-filed suit was initiated in anticipation of the subsequent suit.  *See Anheuser-Busch, Inc.*, 167 F.3d at 419; *University of Pa.*, 850 F.2d at 972; *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599, 602 (5th Cir. 1983); *Ven-Fuel, Inc. v. Department of the Treasury*, 673 F.2d 1194, 1195 (11th Cir. 1982); *Amerada Petroleum Corp. v. Marshall*, 381 F.2d 661, 663 (5th Cir. 1967), *cert. denied*, 389 U.S. 1039 (1968); *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937); *Igloo Prods. Corp.*, 735 F. Supp. at 217; *Merle Norman Cosmetics*, 705 F. Supp. at 299.  "An improper anticipatory filing is 'one made under the apparent threat of a presumed adversary filing the mirror image of that suit' in another court."  *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 557 (S.D.N.Y. 2000) (quoting *Ontel Prods., Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1150 (S.D.N.Y. 1995)).  "Anticipatory suits are disfavored because they are an aspect of forum-shopping."  *Mission Ins. Co.*, 706 F.2d at 602 n.3.  "It has long been established that courts look with disfavor upon races to the courthouse and forum shopping."  *Learning Network, Inc. v. Discovery Communications, Inc.*, 11 Fed. Appx. 297, 301, 2001 WL 627618, at *3 (4th Cir. June 7, 2001).

Another circumstance that may warrant an exception to the first-filed rule arises when the first suit is a declaratory judgment action, "as such an action may be more indicative of a preemptive strike than a suit for damages or equitable relief." *Northwest Airlines, Inc.*, 989 F.2d at 1007; *accord Anheuser-Busch, Inc.*, 167 F.3d at 419; *Boatmen's First Nat'l Bank of Kansas City v. Kansas Pub. Employees Retirement Sys.*, 57 F.3d 638, 641 (8th Cir. 1995); *Goodyear Tire & Rubber Co.*, 920 F.2d at 489 (noting that party against which first-filed declaratory judgment action was filed, whose second-filed action sought damages, "could be considered the 'true plaintiff'"). Indeed, "[i]n some cases, there may come a point after which the potential lawsuit that may otherwise have given rise to a proper declaratory judgment action has become so certain or imminent, that the declaratory judgment action is merely an improper act of forum shopping, or a race to the courthouse." *Learning Network, Inc.*, 11 Fed. Appx. at 301, 2001 WL 627618, at *3 (citing *Quarles*, 92 F.2d at 324; *Citigroup Inc.*, 97 F. Supp. 2d at 557). "Such procedural fencing is a factor that counsels against exercising jurisdiction over a declaratory judgment action." *Id.* (citing *Myles Lumber Co. v. CNA Financial Corp.*, 233 F.3d 821, 824 (4th Cir. 2000); *Centennial Life Ins. v. Poston*, 88 F.3d 255, 257 (4th Cir. 1996); *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 377 (4th Cir. 1994)).

"Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). "On its face, the statute provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration'" *Id.* (citing 28 U.S.C. § 2201(a) (emphasis added)). The United States Supreme Court has "repeatedly characterized the Declaratory Judgment Act as 'an enabling Act,

which confers a discretion on the courts rather than an absolute right upon the litigant.'" *Id.* at

287 (quoting *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952)) (citing

*Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 n.17 (1993); *Green v. Mansour*, 474

U.S. 64, 72 (1985)). "By the Declaratory Judgment Act, Congress sought to place a remedial

arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new

form of relief to qualifying litigants." *Id.* at 288. "'[T]he propriety of declaratory relief in a

particular case will depend upon a circumspect sense of its fitness informed by the teachings and

experience concerning the functions and extent of federal judicial power.'" *Id.* at 287 (quoting

*Wycoff*, 344 U.S. at 243). "In the declaratory judgment context, the normal principle that federal

courts should adjudicate claims within their jurisdiction yields to considerations of practicality and

wise judicial administration." *Id.* at 288.

In this instance, the court concludes that it should abstain from hearing this case due to the

pendency of the related federal court proceeding in West Virginia and what appears to be bad faith

and forum shopping on the part of Anchor. As the West Virginia court pointed out, by its letter

of October 8, 2002, Touchstone put Anchor on notice that it was intending to file suit if adequate

assurances were not forthcoming and the matter was not resolved without court intervention within

the ensuing thirty days. The short period of time, three days, between the issuance of the letter

and Anchor's filing the Texas lawsuit suggests that Anchor "raced to the courthouse to usurp

[Touchstone's] forum choice." *Anheuser-Busch, Inc.*, 167 F.3d at 419. Yet, service was not

immediately effected, and Allen did not mention the fact that suit had been filed when he was in

West Virginia engaging in what Touchstone believed to be good faith negotiations concerning the

dispute. Moreover, Anchor primarily seeks declaratory relief. Although Anchor ostensibly

asserts claims for breach of contract and fraud, the parameters of the claims are vague, the damages unspecified, and the fraud allegations severely lacking under Rule 9(b) of the Federal Rules of Civil Procedure. Anchor is essentially seeking a ruling that the autoclave meets the specifications called for by the contract and that it has no further obligations under the terms of the contract. This is not a situation where a portion of the purchase price remains outstanding or performance is still owed on the part of Touchstone. Instead, Touchstone paid the full contract price prior to shipment of the autoclave, which allegedly has not operated properly since its delivery in West Virginia more than a year ago.

This court concurs with the West Virginia court's assessment of the situation: "Anchor has filed an anticipatory lawsuit in Texas, which suit was filed merely to preempt a suit by the proper plaintiff in this case, Touchstone." The court, therefore, is presented with the option of staying, dismissing, or transferring this action. *See West Gulf Maritime Ass'n*, 751 F.2d at 729 & n.1; *Igloo Prods. Corp.*, 735 F. Supp. at 217. "Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment before trial or after all arguments have drawn to a close." *Wilton*, 515 U.S. at 288. Under these circumstances and in the interest of comity, this court is of the opinion that a stay of the Texas action pending the resolution of the West Virginia lawsuit, where the parties are correctly aligned, is the preferable course of action. Touchstone is the proper party plaintiff, and Anchor can presumably assert its breach of contract and fraud claims as counterclaims in the West Virginia action. The West Virginia court has also found no impediment to exercising personal jurisdiction over Anchor. Thus, this action should be stayed in favor of the affirmative lawsuit bought by Touchstone in West Virginia.

IV.    Conclusion

Accordingly, because Touchstone has sufficient minimum contacts with Texas to satisfy the requirements of personal jurisdiction and the exercise of jurisdiction by this court over Touchstone comports with the notions of fair play and substantial justice, this court recommends that Touchstone's motion to dismiss be denied.  In addition, because Touchstone has not presented compelling reasons for a transfer of venue of this action to the United States District Court for the Northern District of West Virginia, this court recommends that Touchstone's motion to transfer venue be denied.  Finally, because Touchstone has demonstrated that Anchor's action is, in essence, an anticipatory, preemptive, declaratory judgment action brought to deprive the proper plaintiff of its choice of forum, this court recommends that Touchstone's motion to stay this proceeding pending resolution of Touchstone's action initiated in the Northern District of West Virginia be granted.

The Clerk shall send copies of the Memorandum and Recommendation to the respective parties.  The parties have ten days from receipt to file specific, written objections to the Memorandum and Recommendation. *See* FED. R. CIV. P. 72.  Absent plain error, the failure to file objections bars an attack on the factual findings, as well as the legal conclusions, on appeal. The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208-1010.  Copies of the objections must be mailed to the opposing party and to the chambers of the magistrate judge, P.O. Box 610070, Houston, Texas 77208-0070.

SIGNED at Houston, Texas, on this the _15th_ day of ___July___, 2003.

_Marcia A. Crone_

Marcia A. Crone
United States Magistrate Judge